## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS - URBANA DIVISION

JOHN DOE, individually, and on behalf of all others similarly situated,

             Plaintiff,

      v.

SARAH BUSH LINCOLN HEALTH CENTER,

             Defendant.

No.:   23-CV-2170

(Removal from: the First Judicial Circuit Court of Coles County, Illinois, Case No. 2023LA26)

Jury Trial Demanded

## NOTICE OF REMOVAL

Defendant Sara Bush Lincoln Health Center hereby removes this putative class action to federal court pursuant to the federal officer removal statute, codified at 28 U.S.C. § 1442(a)(1). In support, Sarah Bush Lincoln provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see also Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (same).

## NATURE OF THE CASE

1.  This case is one of numerous website privacy cases that have been filed against health care providers throughout the nation, including several that are now pending in Illinois federal court. *Patricia Mayer v. Midwest Physician Administrative Services, LLC, d/b/a Duly Health and Care*, Case No. 23-cv-3132 (N.D. Ill., removed May 17, 2023); *Kurowski, et al. v. Rush System for Health*, Case No. 1:22-cv-05380 (N.D. Ill., filed Sept. 30, 2022); *Michael Krackenberger v. Northwestern Memorial Hospital, et al.*, Case No. 4:22-cv-04203 (N.D. Ill., filed Aug. 10, 2022).

2.  Named plaintiff John Doe filed his putative Class Action Complaint against Sarah Bush Lincoln in the First Judicial Circuit Court of Coles County, Illinois, Case No. 2023LA26, on

June 27, 2023 (*See* Ex. A, State Court Dckt., Compl.) Doe served Sarah Bush Lincoln with a copy of the summons and complaint on July 9, 2023. (*Id.*, Affidavit of Service.)

3.  The underlying factual basis for Doe's complaint is that Sarah Bush Lincoln allegedly violated Illinois law by embedding certain third-party source codes—most prominently the Meta Pixel—onto Sarah Bush Lincoln's publicly available websites, referred to in the complaint as the "Website" and "Online Platforms." (Ex. A, Compl. ¶¶ 5-7, 9-10.)

4.  Doe also alleges that Sarah Bush Lincoln violated Illinois law by installing other tracking technology—such as the Google Tag Manager, Google Analytics, TikTok Ads Manager, and DoubleClick—on its website. (*Id.*, ¶ 18.)

5.  Doe alleges that these tracking tools, including the Meta Pixel, are "bits of code" that collect data on users as they navigate the Website and Online Platforms, including "any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks." (*Id.*, ¶¶ 41, 47.)

6.  The Website and Online Platforms identified by plaintiff include Sarah Bush Lincoln's patient portal, identified in the complaint as the "patient portals" and "patient record portals." (*Id.*, ¶¶ 5, 36.) The link to the SBL patient portal is here: https://www.sarahbush.org/patient-portal/. (the SBL Patient Portal).

7.  Doe alleges that Sarah Bush Lincoln "purposefully installed the Meta Pixel and trackers onto its Website and Online Platforms." (Compl. ¶ 37.) "In doing so, Defendant surreptitiously shared patients' private and protected communications, including those containing Plaintiff's and Class Members' Private Information, with Facebook and other third parties." (*Id.*)

8.  Based on these facts, Doe's complaint contains seven counts against Sarah Bush Lincoln under Illinois law: common law claims for (1) negligence (*id.*, ¶¶ 149-56), (2) negligence *per se* (*id.*,

¶¶ 157-68), (3) invasion of privacy (*id.*, ¶¶ 169-78), (4) breach of implied contract (*id.*, ¶¶ 179-89), (5) unjust enrichment (*id.*, ¶¶ 190-97),  and (6) breach of fiduciary duty (*id.*, ¶¶ 198-204); and a claim under Illinois law for (7) alleged violation of the Illinois Consumer Fraud and Deceptive Practices Act (*id.*, ¶¶ 205-13).

### GROUNDS FOR REMOVAL

9.   Sarah Bush Lincoln removes Doe's complaint under the federal officer removal statute, codified at 28 U.S.C. §1442(a), based on Doe's alleged privacy violations under Illinois state law when an individual clicks on the SBL Patient Portal link.

10.   Under 28 U.S.C. § 1442(a)(1), a civil action that is "against or directed to" any of the following may be removed to federal court: "(1) the United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency therefore, in an office or individual capacity, *for or relating to any act under color of such office . . . ." Id.* § 1442(a)(1) (emphasis added).

11.   To remove under the statute, Sarah Bush Lincoln must show that it: "(1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (citing *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 689-690 (7th Cir. 2016)).

### I.    SARAH BUSH LINCOLN IS A "PERSON" WITHIN THE MEANING OF THE STATUTE.

12.   Doe alleges Sarah Bush Lincoln is "a non-profit corporation organized and existing under the laws of the State of Illinois with its principal place of business at 1000 Health Center Drive, Mattoon, Illinois 61938 in Coles County, Illinois." (Ex. A, Doe Compl. ¶30.)

13. Sarah Bush Lincoln is thus a person under the federal officer removal statute. *See, e.g., Betzner,* 910 F.3d at 1015 (holding that "[c]orporations are persons under § 1442(a)").

## II.    SARAH BUSH LINCOLN ACTED UNDER COLOR OF FEDERAL LAW UNDER 28 U.S.C. § 1442(A)(1).

14. In 2004, "to provide leadership for the development and nationwide implementation of an interoperable information technology infrastructure to improve the quality and efficiency of healthcare," President George W. Bush first established "the position of National Health Information Technology Coordinator." *See* Exec. Order 13335, at pg. 702 (Apr. 27, 2004), *Incentives for the Use of Health Information Technology and Establishing the Position of the National Health Information Technology Coordinator*, available at https://www.presidency.ucsb.edu/documents/executive-order-13335-incentives-for-the-use-health-information-technology-and.

15. Under the Executive Order, "[t]he National Coordinator shall, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.* at pg. 703 (*Section 3, Responsibilities of the National Health Information Technology Coordinator*.)

16. In 2009, Congress codified the National Coordinator position through the Health Information Technology for Economic and Clinical Health Act of 2009 (HITECH Act), *see* 123 Stat. 115, 230 (2009): "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology (referred to in this section as the 'Office.' The Office shall be headed by a National Coordinator who shall be

4

appointed by the Secretary and shall report directly to the Secretary." 42 U.S.C. § 300jj-11(a) (Office of the National Coordinator for Health Information Technology).

17. Congress tasked the National Coordinator with certain federal duties through the HITECH Act, *see* 42 U.S.C. § 300jj-11(c)(1) ("**Duties of the National Coordinator**"), including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics with respect to the following: (i) The electronic exchange and use of health information and the enterprise integration of such information," 42 U.S.C. § 300jj-11(3)(A).

18. The HITECH Act further required, as a duty for the National Coordinator, "**Collaboration**": "The strategic plan shall be updated through collaboration of public and private entities." 42 U.S.C. § 300jj-11(3)(B).

19. From the outset, one important piece of this federal health information technology initiative was for individuals to have access to their health care records online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, *The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care*, at pg. e (July 21, 2004) (discussing a "Medicare beneficiary portal"); *id.* at Attachment 1, Off. of Personnel Mang't Rep. at 6-7 (July 2004) (discussing "MyAnthem," which "provides an easy way to help members gain more control over their health care benefits through secure access that's available at any time and from any place"); *id.* at Attachment 2, Veteran Affairs Rep., at 18 (July 15, 2004) (discussing "My HealtheVet – The Personal Health Record").

20. To make this and other federal health information technology goals a reality, the HITECH Act allocated billions of dollars for the health care system to adopt and meaningfully use "certified

health information technology." *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology).

21. The following year, the Department of Health and Human Services implemented this Congressional enactment through the "Meaningful Use Program" regulations, which is now known as the Promoting Interoperability Program. *See* Vol. 75 Fed. Reg., No. 144, pg. 44314 (Jul. 28, 2010).

22. The Meaningful Use regulations mandated that participants provide their patients with the ability to "view, download, and transmit" their health information online. *See, e.g.*, 42 C.F.R. § 495.20(f)(12)(i)(B) (Objective) ("Beginning in 2014, provide patients with the ability to view online, download, and transmit information about a hospital admission."); *id*. at (ii)(B) (Measure) (health care provider must attest that "more than 50 percent of all unique patients who are discharged from inpatient or emergency department of an eligible hospital or CAH have their information available online within 36 hours after discharge").

23. Sarah Bush Lincoln acted pursuant to these Meaningful Use regulations in making a patient portal available to Sarah Bush Lincoln's patients online. As set forth above, the link to this patient portal is available at https://www.sarahbush.org/patient-portal/. The current Cerner Sarah Bush Lincoln patient portal went live in or around April 2017. Prior to Cerner, Sarah Bush Lincoln utilized a Meditech patient portal, called "Patient and Consumer Health Portal," which went live in or around July 2013.

24. Ongoing usage of the portal is necessary for Sarah Bush Lincoln to meet the Meaningful Use criteria. Sarah Bush Lincoln submits annual reports on Sarah Bush Lincoln's involvement in the Meaningful Use / Promoting Interoperability program to the Center for Medicare and Medicaid Services (CMS) through the QualityNet Secure Portal, also known as QNet. These

reports are made specifically to meet federal requirements and include submissions regarding the Sarah Bush Lincoln patient portal and Sarah Bush Lincoln's patients use of the portal.

### III. DOE'S ILLINOIS STATE LAW CLAIMS ARE "FOR OR RELATING TO" THE SARAH BUSH LINCOLN PATIENT PORTAL.

25. The next requirement for federal officer removal is a causal nexus between Sarah Bush Lincoln's actions taken under federal law and Doe's claims. To meet this requirement, under the plain language of 28 U.S.C. § 1442(a)(1), Doe's claims must only be either "for or relating to" Sarah Bush Lincoln's actions taken under federal law. 28 U.S.C. § 1442(a)(1).

26. This statutory language is met here, because Doe specifically claims that it is an alleged privacy violation under Illinois state law each time an individual clicks onto the Sarah Bush Lincoln patient portal link in particular.

27. Doe alleges that "[u]nder HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization." (Ex. A, State Ct. Docket, Compl. ¶ 99.)

28. Doe further alleges that "[g]uidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA." (*Id.*, ¶ 100; *see also id.*, ¶ 105 (claiming "where an individual seeks medical treatment" is considered PHI under the HIPAA privacy rule) (quoting U.S. Dep't of Health & Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 2, 2022)).

29. And Doe specifically relies upon HIPAA to state his alleged negligence *per se* claim under Illinois state common law. (*Id.*, ¶ 159.) Doe alleges: "Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part

7

160 and Part 164, Subparts A and E ('Standards for Privacy of Individually Identifiable Health Information'), and Security Rule ('Security Standards for the Protection of Electronic Protected Health Information'), 45 C.F.R. Part 160 and Part 164, Subparts A and C, and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to obtain the security and privacy of Plaintiff's and Class Members' Private Information." (*Id.*)

30. Doe further alleges that Sarah Bush Lincoln's "alleged conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct." (*Id.*, ¶ 168.) "Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*." (*Id.*)

31. In sum, through his allegations, Doe alleges that Sarah Bush Lincoln made a patient portal available to Sarah Bush Lincoln's patients online, this portal is an integral part of his complaint (*id.*, ¶¶ 5, 36), and that it is an alleged privacy violation under Illinois state law, based on an alleged violation of HIPAA, giving rise to a claim for negligence *per se* under Illinois state law, every time an individual clicks on that patient poral link to access her health care records online, as an alleged disclosure of patient status in violation of the HIPAA privacy rule.

32. For these reasons, Doe's claims meet the statutory requirement of being "for or related to" Sarah Bush Lincoln's actions taken under color of federal law.

### IV.    SARAH BUSH LINCOLN HAS COLORABLE FEDERAL DEFENSES TO DOE'S ILLINOIS STATE LAW CLAIMS.

33. Finally, Sarah Bush Lincoln has colorable federal defenses to Doe's Illinois state law claims, as set forth below:

34. *First*, when an alleged, and disputed, federal duty forms the basis for plaintiff's alleged state law claims, then removal under 28 U.S.C. 1442(a)(1) is appropriate. *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (holding that "[u]nder the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends upon federal law").

35. As the Supreme Court held in *Mesa v. California*, 489 U.S. 121 (1989): "To assert that a federal statute does *not* impose certain obligations whose alleged existence forms the basis of a civil suit is to rely on the statute in just the same way as asserting that the statute *does* impose other obligations that may shield the federal officer against civil suits." 489 U.S. at 130 (emphasis in original). "Both are equally defensive and equally based in federal law." *Id.*

36. Here, Sarah Bush Lincoln will argue that the specific information that is allegedly disclosed (i.e., IP addresses and other internet metadata) are outside of the purview of protected health information as defined by HIPAA. *See Kurowski v. Rush System for Health*, 2023 WL 4707184, at *3-4 (N.D. Ill. July 24, 2023) (holding that "[t]he interpretation of [individually identifiable health information] offered by HHS in its guidance goes well beyond the meaning of what the statute can bear").

37. *Second*, Sarah Bush Lincoln has a preemption defense to Doe's Illinois state law claims. Federal law preempts state action "either by express provision, by implication, or by a conflict between federal and state law." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995); *see also Murphy v. Nat'l Coll. Ath. Ass'n*, 138 S. Ct. 1461, 1480 (2018) (discussing preemption doctrines).

38. Under this precedent, a defendant cannot be held liable under state law for doing precisely what the federal government wants them to do—as applied here, not only making a patient

portal available online to patients but also promoting the meaningful use of that portal. *See, e.g., Boggs. v. Boggs*, 520 U.S. 833, 844 (1997) ("Conventional conflict pre-emption principles require pre-emption where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

39. *Third,* Sarah Bush Lincoln will argue that the First Amendment is a defense to Doe's claims. In *IMS Health Co. v. Sorrell*, 564 U.S. 552 (2011), the Supreme Court held that "*the creation and dissemination of information are speech within the meaning of the First Amendment*." *Id*. at 570 (emphasis added). Doe's entire complaint challenges how Sarah Bush Lincoln allegedly uses website analytical tools—which in turn both gather and disseminate information—to enhance Sarah Bush Lincoln's ability to speak to the public generally through its publicly available website, www.sarahbush.org. (*E.g.,* Compl. ¶¶ 15, 37, 56.)

40. As the Supreme Court has likewise held: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) (quoting *Reno v. Am. Civil Libs. Union*, 521 U.S. 844, 868 (1977)).

### PROCEDURAL REQUIREMENTS FOR REMOVAL

41. Sarah Bush Lincoln satisfies all of the procedural requirements under 28 U.S.C. § 1446.

42. Sarah Bush Lincoln was served on July 9, 2023 and is filing this notice of removal within thirty days of its receipt of the complaint by service pursuant to 28 U.S.C. § 1446. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999).

43. Sarah Bush Lincoln files this notice of removal in the United States District Court of the Central District of Illinois, because the State court in which the action is pending, the First Judicial Circuit Court of Coles County, Illinois, is within the federal judicial district.

44. The removal notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

45. Sarah Bush Lincoln has attached a copy of the pleadings that were filed in the First Judicial Circuit Court of Coles County prior to removal as Exhibit A.

46. Upon filing this Notice of Removal, Sarah Bush Lincoln will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the First Judicial Circuit Court of Coles Count, Illinois.

**CONCLUSION**

Doe's complaint directly challenges conduct Sarah Bush Lincoln has taken acting under color of federal law and is therefore removable to this Court under 28 U.S.C. § 1442(a)(1).

Dated: August 7, 2023                    Respectfully submitted,

By: /s/ Bonnie Keane DelGobbo
*Counsel for Defendant Sarah Bush Lincoln Health Center*

David A. Carney (*pro hac forthcoming*)      Bonnie K. DelGobbo
dcarney@bakerlaw.com                         bdelgobbo@bakerlaw.com
BAKER & HOSTETLER LLP                        BAKER & HOSTETLER LLP
127 Public Square, Suite 2000                One North Wacker Drive, Suite 4500
Cleveland, Ohio 44114                        Chicago, IL  60606-2841
Telephone: (216) 861-7634                    Telephone: (312) 416.6201

**CERTIFICATE OF SERVICE**

I certify that on August 7, 2023, I filed the foregoing *Notice of Removal* with the Court's ECF system. A copy will be sent electronically to all counsel of record by operation of the ECF system.

*/s/ Bonnie Keane DelGobbo*
*One of the attorneys for Defendant*

# EXHIBIT A

EFILED
7/12/2023 3:49 PM
Melissa Hurst
Circuit Clerk
Coles County, Illinois

## In The Circuit Court Of The 5th Judicial Circuit
## Coles County, Charleston, Illinois

John Doe, Individually, and on behalf of all others
similarly situated,
        Plaintiff(s),

vs.

**CASE NO.: 23 LA 26**

Sarah Bush Lincoln Health Center,
        Defendant(s).



For: **Cates Law Firm LLC**

## AFFIDAVIT OF SERVICE

Received by Meador Investigations, to be served on:

**Sarah Bush Lincoln Health Center c/o Registered Agent Kimberly Uphoff, 1000 Health Center Drive, Mattoon, IL 61938,**

I, **Stephen R Heitz**, being first duly sworn on oath, depose and say the following:

I **SERVED**, on **July 09, 2023 at 6:14 PM**, the within

**30 Day Summons and Class Action Complaint and Jury Demand** In accordance with state statutes in the manner indicated below:

**CORPORATE SERVICE:** By leaving a copy of the above mentioned documents with

Name: **TERI GARDNER** Title: **Supervisor**, an officer or agent of Sarah Bush Lincoln Health Center c/o Registered Agent Kimberly Uphoff.

**At 1000 Health Center Drive, Mattoon, IL 61938.**

Description of person accepting service:

| **Sex** | **Skin** | **Hair** | **Age** | **Height** | **Weight** |
|---|---|---|---|---|---|
| Female | Caucasian | Brown | 54-58 | 5'07" | 140 |

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

Service Fee: **$75.00**

State of Illinois

_____ _Logan_ County

Signed and sworn to before me on

this ___ _6_ ___ day of ___ _July_ ___, _2023_

_Moriah Lowe Pr_
NotaryPublic

SERVED BY: _____
Process Server Number: 129-295481
Meador Investigations
PO Box 157
Lincoln, IL 62656
217.732.1585
IL Lic#117-001077

**\*439010\***

NOTARY PUBLIC STATE OF ILLINOIS
MORIAH LOWE-PRATHER
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
June 30, 2026

IN THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
COLES COUNTY, ILLINOIS

| | |
|---|---|
| JOHN DOE, Individually, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>SARAH BUSH LINCOLN HEALTH CENTER,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)  Cause No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**2023LA26**

## SUMMONS

To each defendant:    Sarah Bush Lincoln Health Center, c/o Registered Agent: Kimberly Uphoff, 1000 Health Center Drive, Mattoon, IL 61938

      You are summoned and required to file an answer in this case, or otherwise file your appearance in the Office of the Clerk of this Court, Coles County Circuit Clerk, 651 Jackson Ave. #128, Charleston, IL 61920, within 30 days after service of this summons, not counting the day of service. **IF YOU FAIL TO DO SO, A JUDGMENT OR DECREE BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.**

      E-Filing is now mandatory for documents in civil cases with limited exceptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov.FAQ/gethelp.asp, or talk with your local circuit clerk's office.

To the officer:

      This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, summons shall be returned so endorsed.

      This summons may not be served later than 30 days after its date.

                            6/27/2023

WITNESS_____, 2023

_____
(Clerk of the Court)

By_____
(Deputy)

7-9-23

EFILED
6/27/2023 11:22 AM
Melissa Hurst
Circuit Clerk
Coles County, Illinois

IN THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
COLES COUNTY, ILLINOIS

| | | |
|---|---|---|
| JOHN DOE, Individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **2023LA26** |
| v. | ) ) | Cause No. _____ |
| SARAH BUSH LINCOLN HEALTH CENTER, | ) ) ) | |
| Defendant. | ) ) ) | |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff, Mr. Doe, Individually, and on behalf of all others similarly situated (hereinafter "Plaintiff") brings this Class Action Complaint against Defendant, SARAH BUSH LINCOLN HEALTH CENTER (hereinafter "SBL" or "Defendant"), and alleges, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.    Plaintiff brings this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information")

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103

of Plaintiff and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a

Meta ("Facebook" or "Meta"), Google, LLC ("Google"), TikTok, DoubleClick, and possibly

others ("the Disclosure").

2.      Information about a person's physical and mental health is among the most

confidential and sensitive information in our society, and the mishandling of medical information

can have serious consequences, including discrimination in the workplace and denial of insurance

coverage. If people do not trust that their medical information will be kept private, they may be

less likely to seek medical treatment, which can lead to more serious health problems down the

road. In addition, protecting medical information and making sure it is kept confidential and not

disclosed to anyone other than the person's medical provider is necessary to maintain public trust

in the healthcare system.

3.      Recognizing these facts, and in order to implement requirements of the Health

Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department

of Health and Human Services ("HHS") has established "Standards for Privacy of Individually

Identifiable Health Information" (also known as the "Privacy Rule") governing how health care

providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, <u>no</u>

health care provider can disclose a person's personally identifiable protected health information to

a third party without express written authorization.

---

*Protected health information.* "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). SBL is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

2

4.     SBL is an Illinois-based, nonprofit hospital and healthcare network. Through its more than fifty clinics and treatment centers, SBL offers a broad range of medical services to East Central and Southern Illinois patients.[3]

5.     Defendant encourages its patients to use its website, https://www.sarahbush.org/, (the "Website") and its various web-based tools and services (collectively referred to as the "Online Platforms"), which allow patients to search for physicians, locate healthcare facilities, access bill and patient portals, learn about specific health conditions and treatment options, sign up for classes and events, and more.

6.     Despite its unique position as a trusted regional healthcare provider, SBL knowingly configured and implemented into its Website devices known as "pixels," which then collected and transmitted patients' information to third parties. This included information and communicated by patients through Defendant's sensitive and presumptively confidential Online Platforms.

7.     When Plaintiff and Class Members used Defendant's Online Platforms, they thought were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook, Google, Microsoft and others into its Website and Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties.

8.     A pixel (also referred to as a "tracker" or "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[4] When a person visits a website with an embedded pixel, the pixel tracks "events"

---

[3] About Us, SARAH BUSH HEALTHCARE, https://www.sarahbush.org/about/sarah-bush-lincoln/ (last visited June 21, 2023).

[4] See Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

(i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[5] Then, the pixel transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[6]

9.      Among the pixels Defendant embedded into its Website and Online Platforms is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a visitor's device, including their IP address, and the pages viewed.[7] When configured, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[8] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[9]

10.      Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' Private Health Information alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

---

[5] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[6] *Id.*
[7] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).
[8] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[9] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

4

11.     In addition to its use of the Meta Pixel to spy on and transmit Plaintiff's and Class Members' Private Information, Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI").[10]

12.     Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[11, 12]

13.     Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[13]

14.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly.

15.     Defendant utilized data from these trackers to market its services and bolster its profits. Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to

---

[10] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

[11] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).

[12] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel.... This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).

[13] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

5

build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

16.     The information that Defendant's Meta Pixel and CAPI sent to Facebook can include the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including, for example, the specific web pages that the view alongside identifying details, such as their IP addresses.

17.     Such information allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Meta Pixel and CAPI. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

18.     In addition to the Facebook tracker and CAPI, Defendant installed other tracking technology, including Google Tag Manager, Google Analytics, TikTok Ads Manager, and DoubleClick. On information and belief, these trackers operate similarly to the Meta Pixel and transmit a website user's Private Information to other third parties.

19.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send Personal Health Information or other confidential medical information collected via its webpages to a hidden third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent.

20.     Neither Plaintiff nor any Class Member signed a written authorization permitting

Defendant to send their Private Information to Facebook, Google, TikTok, and DoubleClick, or any other third parties uninvolved in their treatment.

21.     Despite willfully and intentionally incorporating tracking technology, including the Meta Pixel, potentially CAPI, and other tracking technology, into its Website and servers, SBL has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with third parties including Facebook, and possibly Google, TikTok, DoubleClick, and others.

22.     Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook and other third parties as they communicated their confidential PHI with their healthcare provider via the Website.

23.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

24.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

25.     Upon information and belief, SBL utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

26.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

27.     Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*,: (i) failing to adequately review its marketing programs and web based

7

technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

28.     Plaintiffs seek to remedy these harms and bring causes of action for (I) Negligence, (II) Negligence *Per Se*; (III) Invasion of Privacy, (IV) Breach of Implied Contract, (V) Unjust Enrichment; (VI) Breach of Fiduciary Duty; and (VII) Violation of the Illinois Consumer Fraud and Deceptive Practices Act (CFDPA), 815 Ill. Comp. Stat. § 505/1 *et seq*.

**PARTIES**

29.     Plaintiff, John Doe, is a natural person and a resident and citizen of Illinois, where he intends to remain, with a principal residence in Clark County. He is a patient of SBL and a victim of Defendant's unauthorized Disclosure of Private Information.

30.     Defendant Sarah Bush Lincoln Health Center ("SBL" or "Defendant") is a non-profit corporation organized and existing under the laws of the State of Illinois with its principal place of business at 1000 Health Center Drive, Mattoon, Illinois 61938 in Coles County, Illinois.

**JURISDICTION AND VENUE**

31.     This Court has jurisdiction over the subject matter of this action by virtue of the Illinois Constitution, article 6, section 9, which provides that "Circuit Courts shall have original

8

jurisdiction in all matters justiciable," unless the matter falls into the limited original jurisdiction of the Illinois Supreme Court.

32.    This Court has personal jurisdiction over Defendants because Defendants have engaged in the "transaction of any business within this State." 735 Ill. Comp. Stat. Ann. 5/2-209.

33.    Venue is proper because all Defendants reside, have a principal place of business and do business in Coles County, Illinois, and under the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. Ann. 505/1 *et seq.*, an "action may be commenced in the county in which the person against whom it is brought resides, has his principal place of business, or is doing business, or in the county were the transaction or any substantial portion thereof occurred." *Id.* at 505/10a; *see also* 735 Ill. Comp. Stat. Ann. 5/2-101.

## COMMON FACTUAL ALLEGATIONS

### A. Background

34.    Sarah Bush Lincoln is a nonprofit hospital and regional healthcare network based in Coles County, Illinois. As one of the state's largest healthcare providers, SBL employs approximately 2,900 area residents, including approximately 200 medical providers, representing twenty-eight specialties. Its flagship facility, the Sarah Bush Lincoln Healthcare Center, "provides a full range of acute care services to residents of Coles County and the surrounding nine counties." Additionally, SBL's "[h]ome health services extend to the surroundings [sic] 19 counties in East Central and Southern Illinois." SBL's extended campus, consisting of seventeen different locations, also offers primary care and walk-in services.SBL operates, "Columbus Regional Hospital, the system's flagship facility, [] a 225-bed not-for-profit, providing emergency and surgical services and comprehensive care in numerous specialty areas.[14]

---

[14] About Us, SARAH BUSH HEALTHCARE, https://www.sarahbush.org/about/sarah-bush-lincoln/ (last visited June 21, 2023).

35.    Additionally, SBL operates the SBL Fayette County Hospital, a general hospital and surgery center that provides inpatient, outpatient, and emergency room services to the region's patients, including Medicare and Medicaid recipients.[15]

36.    SBL serves many of its patients via its Online Platforms, which it encourages patients to use to find healthcare services and providers, access information about specific health conditions, sign up for classes and events, access its billing and patient record portals, and more.

37.    To increase the success of its advertising and marketing and sales, Defendant purposely installed the Meta Pixel and trackers onto its Website and Online Platforms. In doing so, Defendant surreptitiously shared patients' private and protected communications, including those containing Plaintiff's and Class Members' Private Information, with Facebook and other third parties.

38.    To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

*i.    Facebook's Business Tools and the Meta Pixel*

39.    As Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[16]

40.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

---

[15] SBL Fayette County Hospital, SARAH BUSH LINCOLN, https://www.sblfch.org/ (last visited June 21, 2023).
[16] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

41.     Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

42.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[17] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[18]

43.     One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[19] When a user accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

44.     Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy (such as the homepage) and disable it on pages that do implicate patient privacy (such as Defendant's physician search page[20]).

---

[17] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).
[18] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.
[19] Retargeting, META, https://www.facebook.com/business/goals/retargeting.
[20] SARAH BUSH LINCOLN, https://www.sarahbush.org/physicians/search/ (last visited June 21, 2023).

45.    The Meta Pixel's primary purpose is for marketing and ad targeting and sales generation.[21]

46.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[22]

47.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** (emphasis added).

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[23]

48.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales.** Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

---

[21] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[22] About Meta Pixel, META,
https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).
[23] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[24]

49.    Facebook likewise benefits from the data received from the Meta Pixel and uses the data to serve targeted ads and identify users to be included in such targeted ads.

### ii.    Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel

50.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

51.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

52.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[25]

53.    GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

---

[24] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).
[25]"Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

54.     When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information (such as Defendant's physician search page). The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

55.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

56.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

57.     Defendant's implementation of the Meta Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for Defendant.

58.     Separate from the Meta Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the patient associated with the Private Information it has intercepted.

59.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on

14

gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from the entity's server to Facebook's server.

60.     Conversions API "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[26] Thus, the entity receives and stores its communications with patients on its server before Conversions API collects and sends those communications—and the Private Information contained therein—to Facebook.

61.     Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

62.     While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[27]   Thus, if an entity implemented the Meta Pixel in in accordance with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions API tool on its Website.

63.     The third parties to whom a website transmits data through pixels and other tracking technology do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to

---

[26] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).
[27] *See* Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).

64.     Accordingly, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

65.     In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

66.     Consequently, when Plaintiff and Class Members visited Defendant's website and communicated their Private Information, it is simultaneously intercepted and transmitted to Facebook.

67.     SBL also employed other trackers, including Google Tag Manager, Google Analytics, TikTok Ads Manager, DoubleClick, which, on information and belief, likewise transmitted Plaintiff's and the Class Members' Private Information to third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii.     Defendant Violated its own Privacy Policies

68.     SBL is covered under its SBL Joint Notice of Privacy Practices ("Privacy Notice")[28] and its Patient Rights and Responsibilities policy ("Notice of Rights"),[29] which are posted and maintained on Defendant's Website (together referred to as "Privacy Policies").

---

[28] SBL Joint Notice of Privacy Practices, SARAH BUSH LINCOLN, https://www.sarahbush.org/hospital-services/forms-policies/privacy-policy/ (last visited June 21, 2023), **attached as Exhibit A.**
[29] Patient Rights and Responsibilities, SARAH BUSH LINCOLN, https://www.sarahbush.org/hospital-services/forms-policies/patients-rights-responsiblities/ (last visited June 21, 2023), **attached as Exhibit B.**

16

serve the marketing purposes of the website owner (i.e., to bolster profits).

serve the marketing purposes of the website owner (i.e., to bolster profits).

64.     Accordingly, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

65.     In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

66.     Consequently, when Plaintiff and Class Members visited Defendant's website and communicated their Private Information, it is simultaneously intercepted and transmitted to Facebook.

67.     SBL also employed other trackers, including Google Tag Manager, Google Analytics, TikTok Ads Manager, DoubleClick, which, on information and belief, likewise transmitted Plaintiff's and the Class Members' Private Information to third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii.   *Defendant Violated its own Privacy Policies*

68.     SBL is covered under its SBL Joint Notice of Privacy Practices ("Privacy Notice")_[28] and its Patient Rights and Responsibilities policy ("Notice of Rights"),[29] which are posted and maintained on Defendant's Website (together referred to as "Privacy Policies").

---

[28] SBL Joint Notice of Privacy Practices, SARAH BUSH LINCOLN, https://www.sarahbush.org/hospital-services/forms-policies/privacy-policy/ (last visited June 21, 2023), **attached as Exhibit A.**
[29] Patient Rights and Responsibilities, SARAH BUSH LINCOLN, https://www.sarahbush.org/hospital-services/forms-policies/patients-rights-responsiblities/ (last visited June 21, 2023), **attached as Exhibit B.**

69.    Defendant's Privacy Notice provides, "[t]his notice describes how medical information about you may be used and disclosed and how you can get access to this information."[30]

70.    SBL 's Privacy Notice further states,

This organization is required to:
- Maintain the privacy of your health information.
- Provide you with a notice as to our legal duties and privacy practices with respect to information we collect and maintain about you.
- Abide by the terms of this notice.
- Notify you if we are unable to agree to a requested restriction.
- Accommodate reasonable requests you may have to communicate health information by alternative means or at alternative locations.

**We will not use or disclose your health information without your authorization, except as described in this notice.**[31]

71.    Although SBL states that patient information may be used as "source of data for facility planning and marketing," it never disclosed patient's Private Information is shared with third-parties like Facebook, for the purpose of sole purpose of marketing its services.

72.    Additionally, SBL's Notice of Rights states:

When receiving care or service from Sarah Bush Lincoln (SBL), you have the right to . . . every consideration of privacy, dignity and to expect that all communications and records pertaining to your care will be treated with upmost confidentiality. This includes all photographic, film image, video, electronic or audio media that may be part of your care or created with your permission by virtue of agreeing to a test and/or procedure that captures/uses images and/or electronic data. Verbal, written and/or images as described will be given to other healthcare professionals for use in continuing your care and/or upon your request for yourself or others after informed consent and/or permission and with diligent care for the protection of your personal health information. You have every right to request cessation and/or to rescind permission/consent at any time and to be assured that anyone involved in your care is bound by the hospital's confidentiality agreement.[32]

---

[30] *Id.*

[31] *Id.* (emphasis added).

[32] Patient Rights and Responsibilities, SARAH BUSH LINCOLN, https://www.sarahbush.org/hospital-services/forms-policies/patients-rights-responsiblities/ (last visited June 21, 2023).

73.    On information and belief, Defendant does not maintain a separate Website privacy policy. Nowhere in SBL's Privacy Policies does it disclose that information communicated to it via its Website is not private or confidential.

74.    Despite its representations and omissions in its Privacy Policies, SBL does indeed transfer Private Information to third parties. Using the Meta Pixel, Defendants used and disclosed Plaintiff's and Class Member's Private Information and confidential communications to Facebook, Google, and like other unauthorized third parties, without written authorization, and in violation of its Privacy Policies.

75.    Defendants disclosed Plaintiff's and Class Members' Private Information and confidential communications to Facebook and others by collecting and transmitting user interactions with Defendant's Website and sending records of those interactions to Facebook. For example, when a patient visits Defendants' Website and clicks "Colon Cancer" under Defendants' "Services and Conditions" page, the individual's browser sends a request to Defendants' server requesting that it load the webpage. Then, Meta Pixel sends secret instructions back to the individual's browser, causing it to imperceptibly record the patient's communication with SBL and transmit the paged viewed by the patient to Facebook's servers, alongside the patient's IP address, and sometimes, the patient's unique Facebook ID. Thus, the name of the patient's health condition, alongside identifying information, is reported back to Facebook, thereby revealing the patient's Private Information.

76.    Defendant could have chosen not to use the Meta Pixel and other tracking technology, or it could have configured its trackers to limit the information that it communicated to third parties, but it did not. Instead, it intentionally took advantage of these trackers' features and functions, resulting in the Disclosure of Plaintiffs' and Class Members' Private Information.

18

77.     Defendant used and disclosed Plaintiff's and Class Members' Private Information to Facebook, Google, and possibly other third parties for the purpose of marketing its services and increasing its profits.

78.     On information and belief, Defendants shared, traded, or sold Plaintiff's and Class Members' Private Information with Facebook, and potentially other third parties, in exchange for improved targeting and marketing services.

79.     Plaintiffs never consented, agreed, authorized, or otherwise permitted Defendant SBL to intercept their communications or to use or disclose their Private Information for marketing purposes. Plaintiff was never provided with any written notice that Defendant disclosed its patients' Protected Health Information to Facebook and others, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's Protected Health Information to unauthorized entities.

80.     Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

81.     Furthermore, Defendants actively misrepresented that they would preserve the security and privacy of Plaintiff's and Class Members' Private Information. In actuality, Defendant shared data about Plaintiffs' and Class Members' activities on the Online Platforms alongside identifying details about the Plaintiffs and Class Members, such as their IP addresses.

82.     By law, Plaintiffs and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. SBL deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, Personally Identifiable

19

Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and possibly others; and (3) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

**B. Plaintiff's Experience**

83.     Plaintiff John Doe has been a patient of Defendant for at least fifteen years. He has received healthcare services from SBL and physicians in SBL's network, and he relied on SBL's Online Platforms to communicate confidential patient information.

84.     Mr. Doe last used SBL's Website approximately 18 months ago, when he was used it to search for a doctor to treat his back pain. After Mr. Doe used the Online Platforms, advertisements for back surgery began appearing in Mr. Doe's Facebook feed.

85.     Plaintiff uses Defendant's Website and/or Online Platforms approximately two times a month. In the past, Mr. Doe has used Defendant's Online Platforms to find a search for other doctors, including a new primary care physician, a neck surgeon, a dermatologist, and a physical therapist. He has also used the Website to locate Defendant's treatment facilities.

86.     Plaintiff accessed Defendant's Online Platforms at Defendant's direction and encouragement. Mr. Doe reasonably expected that his online communications with SBL were confidential, solely between himself and SBL, and that, as such, those communications would not be transmitted to or intercepted by a third party.

87.     Plaintiff Mr. Doe provided his Private Information to Defendant and trusted that the information would be safeguarded according to SBL's privacy policies and the law.

20

88.   As described herein, by use of the Meta Pixel and tracking technology, SBL sent Mr. Doe's Private Information to Facebook and possibly others when he used Defendant's Online Platforms to communicate healthcare and identifying information to SBL.

89.   Pursuant to the process described herein, SBL assisted Facebook and possibly otthers intercepting Mr. Doe's confidential communications, including those that contained PII and PHI. SBL facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

90.   By failing to receive the requisite consent, SBL breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

**C. Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

91.   In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[33] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

92.   On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive

---

[33] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

data."[34]

93.     The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[35] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[36]

94.     More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[37]

---

[34] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021)
https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[35] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.)
https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[36] *Id.*
[37] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

95.     Furthermore, in June 2022, an investigation by The Markup[38] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[39] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[40] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[41]

96.     During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[42]

97.     In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[43]

98.     David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply

---

[38] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last accessed Mar. 19, 2023).
[39] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*

troubled" by what the hospitals capturing and sharing patient data in this way.[44]

**D. Defendant Violated HIPAA Standards**

99.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[45]

100.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

101.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[46]

102.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis

---

[44] *Id.*

[45] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[46] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012)
https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

24

added).[47]

103.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[48]

104.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[49]

105.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as

---

[47] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002)
https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.
[48] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,
https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.
[49] *Id.*

expressly permitted or required by the HIPAA Privacy Rule.[50]

106.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules.

**E. Defendant Violated Industry Standards**

107.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

108.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to SBL and its physicians.

109.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

110.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

111.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

---

[50] *Id.* (emphasis in original) (internal citations omitted).

**F. Plaintiff's and Class Members' Expectation of Privacy**

112.   At all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

**G. IP Addresses are Personally Identifiable Information**

113.   Defendant also disclosed and otherwise assisted Facebook and potentially others with intercepting Plaintiff's and Class Members' IP addresses using the Meta Pixel and other tracking technologies.

114.   An IP address is a number that identifies the address of a device connected to the Internet.

115.   IP addresses are used to identify and route communications on the Internet.

116.   IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

117.   Facebook tracks every IP address ever associated with a Facebook user.

118.   Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

119.   Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

27

120.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

## H. Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures

121.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was marketing and profits.

122.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

123.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

124.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

## I. Plaintiff's and Class Members' Private Information Had Financial Value

125.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

126.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is due to increase; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

127.   In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[51]

128.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[52]

## TOLLING, CONCEALMENT, AND ESTOPPEL

129.   The applicable statutes of limitation have been tolled as a result of SBL's knowing and active concealment and denial of the facts alleged herein.

130.   SBL seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. SBL knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, and likely other third parties, including Google, TikTok, and DoubleClick.

131.   Plaintiff and Class Members could not with due diligence have discovered the full scope of SBL's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel or any other tracking technology.

---

[51] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[52] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

132.   All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. SBL's illegal interception and disclosure of Plaintiff's Private Information has continued unabated through the present. What's more, SBL was under a duty to disclose the nature and significance of their data collection practices but did not do so. SBL is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

133.   Plaintiff brings this statewide class action on behalf of himself and on behalf of other similarly situated persons.

134.   The statewide Class that Plaintiff seeks to represent is defined as follows:

**All Illinois citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

135.   Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

136.   Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

137.   <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly accessed in the Disclosure, and each Class is

apparently identifiable within Defendant's records.

138.   Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include

    a.   whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

    b.   whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

    c.   whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

    d.   whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

    e.   whether Defendant failed to adequately safeguard Plaintiff's and Class Members' Private Information;

    f.   whether and when Defendant actually learned of the Disclosure;

    g.   whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

    h.   whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

    i.   whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

    j.   whether Defendant adequately addressed and fixed the vulnerabilities that permitted the Disclosure to occur; and

31

k. whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiff's and Class Members' Private Information.

139. Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

140. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

141. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

142. Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

143.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

144.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

145.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

33

146.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding Disclosure, and Defendant may continue to act unlawfully as set forth in this Complaint.

147.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

148.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

      a.  whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      b.  whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      c.  whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

      d.  whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

      e.  whether Defendant breached the implied contract;

      f.  whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

      g.  whether Defendant failed to implement and maintain reasonable security

procedures and practices appropriate to the nature and scope of the information compromised in the Disclosure;

h.  whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information; and

i.  whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

149.  Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

150.  Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

151.  Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

152.  Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

153.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

154.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

155.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

156.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

157.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

158.   Plaintiff alleges this negligence *per se* theory as alternative to his other negligence claims.

159.   Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C, and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Private Information.

160.   Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

161.   Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

162.   Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

163.   It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-party such as Facebook gaining access to Plaintiff's and Class Members' PII and PHI, resulting in Defendant's liability under principles of negligence *per se*.

164.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

165.    Plaintiff's and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

166.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

167.    In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

168.    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

## COUNT III
## INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

169.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

170.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and Online Platforms and the communications platforms and services therein.

171.    Plaintiff and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

172.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion and their private affairs and concerns.

173.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations and Privacy Policies. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

174.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

175.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

39

176.   Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

177.   Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

178.   Plaintiff also seeks such other relief as the Court may deem just and proper.

### COUNT IV
### BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

179.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

180.   As a condition of receiving medical care from Defendant, Plaintiff and the Class provided their Private Information and paid compensation for the treatment received. In so doing, Plaintiff and the Class entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policies and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

181.   Implicit in the agreement between SBL and its patients, Plaintiff and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

182.   SBL had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from SBL.

40

183. SBL had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

184. Additionally, SBL implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

185. Plaintiff and Class Members fully performed their obligations under the implied contract with SBL. SBL did not. Plaintiff and Class Members would not have provided their confidential Private Information to SBL in the absence of their implied contracts with SBL and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from SBL.

186. SBL breached the implied contracts with Plaintiff and Class members by disclosing Plaintiff's and Class Members' Private Information to an unauthorized third party.

187. SBL's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

188. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

189. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

### COUNT V
### UNJUST ENRICHMENT
#### (On Behalf of Plaintiff and the Class)

190. Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

191.    This claim is pleaded solely in the alternative to Plaintiff's Breach of Implied Contract claim.

192.    Plaintiff and Class members conferred a monetary benefit upon SBL in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

193.    Plaintiff and Class Members would not have used SBL's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

194.    SBL appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class members.

195.    As a result of SBL's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

196.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

197.    SBL should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Disclosure alleged herein.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

198.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

199.    A relationship existed between Plaintiff and the Class, on the one hand, and Defendant, on the other, in which Plaintiff and the Class put their trust in Defendant to protect the Private Information of Plaintiff and the Class, and Defendant accepted that trust.

200.    Defendant breached the fiduciary duty that it owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their Private Information.

201.    Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiff and the Class.

202.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiff and the Class would not have occurred.

203.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiff and the Class.

204.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

43

**COUNT VII**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**PRACTICES ACT, 815 Ill. Comp. Stat. § 505/1 *et seq.***
**(On Behalf of Plaintiffs and the Class)**

205.   Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

206.   The Illinois Consumer Fraud and Deceptive Practices Act ("CFDPA") makes it unlawful to employ "[u]unfair methods of competitions and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in [this section] . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. Ann. 505/2.

207.   Defendants were engaged "in the conduct of trade or commerce" by hosting and publishing their Website that they encouraged their patients to use and where they advertised their healthcare services to the public. *Id.*

208.   SBL used unfair and deceptive acts or practices in the conduct of trade or commerce, including but not limited to the following.

   a.   Defendants encouraged their patients to use their Website and Online Platforms while representing their commitment to protecting the privacy of their Personal Information. Meanwhile, Defendants shared Plaintiff and Class Members' Private Information with Facebook and possible others, without Plaintiff and Class Members' knowledge or consent.

   b.   Defendants promised that they would not use Plaintiff and Class Members' PHI for undisclosed purposes without Plaintiff's and Class Members' permission. At the

44

same time, Defendants knowingly collected Plaintiff's and Class Members' private information and transmitted to third parties like Facebook, exclusively for the purpose of marketing and profits. On information and belief, Defendants then used this information to market their services to Plaintiff and Class Members.

c.  Plaintiff and Class Members relied on SBL's representations in using SBL's Online Platform and thought they were communicating only with their trusted healthcare provider. In actuality, Defendant was surreptitiously intercepting and transmitting Plaintiff's and Class Member's communications from Plaintiff's and Class Members' browsers directly to Facebook.

209.    SBL's Disclosure of Plaintiff and Class Members' Private Information was willful, knowing, and done with intent that Plaintiff and Class Members rely upon the concealment, suppression or omission of a material fact: that SBL was tracking Plaintiff's and Class Members' Private Information, using it for advertising purposes without their permission, and disclosing that information to unauthorized third parties.

210.    The CFDPA provides that "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper." 815 Ill. Comp. Stat. Ann. 505/10a(a). Further, "the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." Id. at 505/10a(b).

211.    Had Plaintiffs and members of the Classes been aware that their Private Information would be transmitted to unauthorized third parties, they would not have entered into such transactions and would not have provided payment or confidential medical information to SBL.

45

212.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices in violation of the DCSA, Plaintiff and Class Members have suffered damages for which Defendants are liable, including, but not limited to, the following.

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

b.    Defendants eroded the essential confidential nature of the doctor-patient relationship.

c.    Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

d.    Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality.

e.    Defendants' actions diminished the value of Plaintiffs' and Class Members' personal information.

213.    Plaintiff and Class Members seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for Defendant's repeated and ongoing violations, Plaintiff and Class Members are entitled to, inter alia, actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, JOHN DOE, Individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.    for an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B. for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

D. for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F. for an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. for an award of punitive damages, as allowable by law;

H. for an award of attorneys' fees under the CFDPA, the common fund doctrine, and any other applicable law;

I. costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

J. pre- and post-judgment interest on any amounts awarded; and

K. such other and further relief as this court may deem just and proper.

47

## DEMAND FOR JURY TRIAL

Plaintiff, pursuant to 735 Illinois Compiled Statutes 5/2-1105, hereby demands a trial by jury on all issues so triable.

Dated: June 27, 2023

Respectfully submitted,

By:      /s/David Cates
David Cates, #6289198
Katie E. St. John, #6340448
THE CATES LAW FIRM, LLC
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone:   (618) 277-3644
Facsimile:   (618) 277-7882
Email:      dcates@cateslaw.com
            kstjohn@cateslaw.com

Lynn A. Toops (No. 26386-49)
Mary Kate Dugan (No. 37623-49)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

48

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

***Counsel for Plaintiff and the Proposed Class***

49

# EXHIBIT A

# SBL JOINT NOTICE OF PRIVACY PRACTICES

## *Updated February 2020*

## (Spanish version below)

This notice describes how information about you may be used and disclosed and how you can get access to this information. Please review it carefully.

**Our Responsibilities**
This organization is required to:

- Maintain the privacy of your health information.
- Provide you with a notice as to our legal duties and privacy practices with respect to information we collect and maintain about you.
- Abide by the terms of this notice.
- Notify you if we are unable to agree to a requested restriction.
- Accommodate reasonable requests you may have to communicate health information by alternative means or at alternative locations.

We will not use or disclose your health information without your authorization, except as described in this notice.

We reserve the right to change our practices and to make the new provisions effective for all protected health information we maintain. Should our information practices change, we will create a revised notice, which will be available by request and on our website.

**Understanding Your Health Record/Information**
Each time you visit a hospital or healthcare provider, a record of your visit is made. Typically, this record contains your symptoms, examination and test results, diagnoses, treatment, and a plan for future care or treatment. This information, often referred to as your health or medical record, serves as a:

- Basis for planning your care and treatment.
- Means of communication among the many health professionals who contribute to your care.
- Legal document describing the care you received.
- Means by which you or a third-party payer can verify that services billed were actually provided.
- A source of data for medical research.
- A source of information for public health officials to improve the health of the nation.
- A source of data for facility planning and marketing.
- A tool with which we can assess and continually work to improve the care we render and the outcomes we achieve.

**Understanding what is in your record and how your health information is used helps you to:**

- Ensure its accuracy.
- Better understand who, what, when, where, and why others may access your health information.
- Make more informed decisions when authorizing disclosure to others.

## Your Health Information Rights

Although your health record is the physical property of the healthcare practitioner or facility that compiled it, the information belongs to you. You have the right to the following subject to limitations in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Health Information Technology for Economic and Clinical Health Act (HITECH) of 2009:

- Request that your health information not be shared with your insurer, if you pay your bill for services at the time of registration.
- Request a restriction on certain uses and disclosures of your information. We are required to consider all requests for restrictions carefully and are not required to agree to your request. You do not have the right to restrict health information for treatment, subpoenas, and/or court orders.
- Obtain a copy of the Joint Notice of Privacy Practices upon request. These are kept primarily at each registration area in SBL entities and on our website.
- Inspect and receive a copy of your health record.
- Amend your health record. We will review each amendment request carefully and if we believe that the information that you would like to amend is accurate and complete, your request will be completed. If your request for an amendment is denied, you will be notified of the reason for the denial.
- Obtain an accounting of disclosures of your health information for purposes other than treatment, payment, healthcare operations, or an authorization that has been signed by you.
- Request communications of your health information by alternative means or at alternative locations.
- Revoke your authorization to use or disclose health information except to the extent that action has already been taken.

## For More Information or to Report a Problem

If you have questions about this Notice or talk about a problem, contact the Compliance/Privacy Officer at (217) 258-4147. If you believe your privacy rights have been violated, you can file a complaint with the Compliance/Privacy Officer. In addition, you can file a written complaint to the Secretary of U.S. Department of Health and Human Services. Persons filing a complaint in good faith shall not be subject to retaliation.

## Examples of Disclosures for Treatment, Payment and Health Operations:
### We will use your health information for treatment.

For example: Information obtained by a nurse, medical provider, or other member of your healthcare team will be recorded in your record and used to determine the course of treatment that should work best for you. Your medical provider will document in your record his or her expectations of the members of your healthcare team. Members of your healthcare team will then record the actions they took and their observations. In that way, the medical provider will know how you are responding to treatment.

## We may disclose your health information in the following circumstances.

- When we attempt to obtain your consent and are unable to do so, because you are unconscious or otherwise incapacitated and we reasonably infer that you would have consented with these barriers to communication.
- When you require emergency treatment.
- When we are required by law to disclose your health information.

## We will use your health information for payment.

For example: A bill may be sent to you or a third-party payer. The information on or accompanying the bill may include information that identifies you, as well as your diagnosis, procedures, and supplies used.

## We will use your health information for regular business operations.

For example: Members of the medical staff and process improvement teams may use information in your health record to assess the care and outcomes in your case and others like it. This information will be used in an effort to continually improve the quality and effectiveness of the healthcare and service provided.

**Business Associates:** There are some services provided in our organization through contracts with

business associates. For example, external lab service for certain laboratory tests. When these services are contracted, we may disclose your health information to our business associate so that they can perform the job we've asked them to do. To protect your health information, however, we require the business associate to enter into an agreement with Sarah Bush Lincoln.

**Directory:** Unless you notify us that you object, we will use your name, location in the facility and religious affiliation for directory purposes. This information may be provided to members of the clergy and, except for religious affiliation, to other people who ask for you by name.

**Notification:** Unless you notify us that you object, we may use or disclose information to notify or assist in notifying a family member, personal representative, or another person responsible for your care, your location, and general condition.

**Communication with family:** Unless you notify us that you object, health professionals, using their best judgment, may disclose to a family member, other relative, close personal friend or any other person you identify, health information relevant to that person's involvement in your care or payment related to your care.

**Research:** We may disclose information without your authorization to researchers when our Institutional Review Board has approved a waiver of authorization for disclosure. The researcher has established protocols to ensure the privacy of your health information.

**Medical Examiner:** We may disclose health information to a medical examiner as authorized by law.

**Funeral Directors:** We may disclose health information to funeral directors consistent with applicable law to carry out their duties.

**Organ Procurement Organizations:** Consistent with applicable law, we may disclose health information to organ procurement organizations or other entities engaged in the procurement, banking, or transplantation of organs for the purpose of tissue donation and transplant.

**Disaster Relief:** We may use or disclose health information for disaster relief purposes to the extent authorized by law.

**To Stop a Serious Threat:** We may share your health information to prevent a serious and urgent threat to the health and safety of you or someone else. For example: A threat to harm another person may be reported to the police.

**Military Authorities:** If you are a member or veteran of the armed forces, we may share your health information with the military as authorized or required by law. We may share health information about foreign military personnel to the proper foreign military authority.

**Workers Compensation:** We may disclose health information to the extent authorized by and to the extent necessary to comply with laws relating to workers compensation or other similar programs established by law.

**Public Health Reporting:** We may disclose health information for the following public health activities and purposes:

- To report for the purposes of preventing or controlling disease, injury, or disability, as required by law and public health concerns.
- To report suspected abuse, neglect, or exploitation of children or vulnerable adults to public health or other government authorities authorized by law.
- To report information about products under the jurisdiction of the U.S. Food and Drug Administration.
- To alert a person who may have been exposed to a communicable disease or may otherwise be at risk for contracting or spreading a disease or condition.

- To report information to your employer as required by law. For example: State and local health departments and Prevention, and Occupational Safety and Health Administration (OSHA).

**Health Oversight Activities:** We may disclose your health information to health oversight agency that ensures that we are complying with the rules of government programs such as Medicare and Medicaid.

**Correctional Institution:** Should you be an inmate of a correctional institution, we may disclose to the institution or agents thereof health information necessary for your health and the health and safety of other individuals.

**Law Enforcement:** We may disclose health information for law enforcement purposes as required by law, in response to a valid subpoena, or in compliance with a court order. We may also disclose limited health information to police or law enforcement officials for identification and location purposes and to assist with criminal investigations.

**Fundraising:** We may use certain information (name, address, telephone number or email information, age, date of birth, gender, health insurance status, dates of service, department of service information, treating physician information or outcome information) to contact you for the purpose of raising money for Sarah Bush Lincoln and you will have the right to opt out of receiving such communications with each solicitation. For the same purpose, we may provide your name to the Sarah Bush Lincoln Health Foundation.  The money raised will be used to expand and improve the services and programs we provide the community. You are free to opt out of fundraising solicitation, and your decision will have no impact on your treatment or payment for services at Sarah Bush Lincoln.

## Aviso De Prácticas De Privacidad Conjuntas De Sarah Bush Lincoln

### *Actualizado en agosto de 2020*

Este aviso describe cómo se puede usar y revelar su información médica, y cómo puede tener acceso a la misma. Revíselo cuidadosamente.

**Nuestras obligaciones**
Sarah Bush Lincoln Health System debe:

- Conservar la privacidad de su información médica.
- Darle un aviso de nuestras obligaciones legales y prácticas de privacidad en relación con la información sobre usted que recopilamos y conservamos.
- Cumplir los términos de este aviso.
- Notificarle si no podemos aceptar una restricción que haya solicitado.
- Adaptarse a las solicitudes razonables que usted pueda hacer para que le comuniquen la información médica por medios alternativos o en lugares alternativos.

No usaremos ni revelaremos su información médica sin su autorización, con excepción de lo que se describe en este aviso.
Nos reservamos el derecho a cambiar nuestras prácticas y hacer efectivas las nuevas disposiciones para toda la información médica protegida que mantenemos. Si nuestras prácticas de información cambian, crearemos un aviso revisado que estará disponible a solicitud y en nuestro sitio web.

**Entender su expediente médico/información médica**
Cada vez que visita un hospital o un proveedor de atención médica, se hace un registro de su visita. Generalmente, este registro contiene sus síntomas, examen y resultados de pruebas, diagnósticos, tratamiento y un plan para la atención o el tratamiento en el futuro. Esta información, que muchas veces se menciona como su expediente médico o de salud, sirve como:

2:23-cv-02170-CSB-EIL    # 1    Filed: 08/07/23    Page 73 of 78

- La base para planificar su atención y tratamiento.
- Medio de comunicación entre los diferentes profesionales de la salud que contribuyen a su salud.
- Documento legal que describe la atención que recibió.
- ☐Medio por el que usted o un pagador tercero puede verificar que los servicios facturados realmente se prestaron.
- Una fuente de información para investigaciones médicas.
- ☐Una fuente de información para los representantes de salud pública para mejorar la salud del país.
- Una fuente de información para planificación y mercadeo de las instalaciones.
- Una herramienta con la que podemos evaluar y trabajar continuamente para mejorar la atención que prestamos y los resultados que logramos.

**Comprender qué hay en su expediente y cómo se usa su información médica le ayuda a:**

- Garantizar su precisión.
- Entender mejor quién, qué, cuándo, dónde y por qué otras personas pueden acceder a su información médica.
- Tomar decisiones más informadas cuando autoriza la revelación a los demás.

**Sus derechos sobre su información médica**

A pesar de que su expediente médico es propiedad física del profesional de atención médica o del centro que lo reunió, la información le pertenece a usted. Sujeto a las limitaciones de la Ley de portabilidad y responsabilidad de seguros de salud de 1996 (Health Insurance Portability and Accountability Act, HIPAA) y de la Ley de tecnología de información de la salud para la economía y la salud clínica (Health Information Technology for Economic and Clinical Health Act, HITECH) de 2009, usted tiene derecho a:

- ☐Pedir que su información médica no se comparta con su aseguradora, si usted paga la factura por sus servicios al momento del registro.
- ☐Solicitar una restricción de ciertos usos y revelaciones de su información. Se nos exige considerar todas las solicitudes de restricciones cuidadosamente y no se nos exige aceptar su solicitud. Usted no tiene derecho a restringir la información médica para tratamiento, citaciones ni órdenes del tribunal.
- Obtener una copia del Aviso conjunto de prácticas de privacidad cuando la solicite. Estas se mantienen principalmente en cada área de registro en las entidades del SBL y en nuestro sitio web.
- Inspeccionar y recibir una copia de su expediente médico.
- ☐Enmendar su expediente médico. Revisaremos cuidadosamente cada solicitud de enmienda y, si consideramos que la información que quiere enmendar es precisa y está completa, se aceptará su solicitud. Si se deniega su solicitud de enmienda, se le notificará la razón de la denegación.
- Tener un recuento de las revelaciones de su información médica para propósitos que no sean su tratamiento, pago, operaciones de atención médica o una autorización que usted haya firmado.
- ☐Solicitar comunicaciones de su información médica por medios alternativos o en lugares alternativos.
- Revocar su autorización para usar o revelar información médica, excepto en la medida en que ya se haya hecho.

**Si desea obtener más información o reportar un problema**

Si tiene preguntas sobre este Aviso o desea hablar sobre un problema, comuníquese con el director de cumplimiento/privacidad al (217) 258-4147. Si cree que sus derechos de privacidad han sido violados, puede presentar una queja al director de cumplimiento/privacidad. Además, puede presentar una queja por escrito al secretario del Departamento de Salud y Servicios Humanos de EE. UU. (U.S. Department of Health and Human Services). Las personas que presenten una queja de buena fe no estarán sujetas a represalias.

**Ejemplos de revelaciones para tratamiento, pago y operaciones médicas:**

Usaremos su información médica para tratamiento.

Por ejemplo: la información obtenida por un enfermero, proveedor médico u otro miembro de su equipo de atención médica se registrará en su expediente y se usará para determinar el curso del tratamiento que funcionará mejor para usted. Su proveedor médico documentará en su expediente las expectativas de los miembros de su equipo de atención médica. Entonces, los miembros de su equipo de atención médica

registrarán las acciones que tomen y sus observaciones. De esa manera, el proveedor médico sabrá cómo usted está respondiendo al tratamiento.

**Podemos revelar su información médica en estas circunstancias.**

- Cuando intentemos obtener su consentimiento y no podamos porque usted no esté consciente o esté incapacitado de otra manera y deducimos razonablemente que usted habría dado su consentimiento con estas dificultades en la comunicación.
- Cuando necesite tratamiento de emergencia.
- Cuando se nos pida por ley revelar su información médica.

**Usaremos su información médica para pago.**
Por ejemplo: se le puede enviar una factura a usted o a un pagador tercero. La información de la factura o que la acompaña puede incluir información que lo identifique, así como su diagnóstico, los procedimientos y los suministros que
se usaron.

**Usaremos su información médica para las operaciones comerciales regulares.**
Por ejemplo: los miembros del personal médico y los equipos para la mejora de los procesos pueden usar la información en su expediente médico para evaluar la atención y los resultados en su caso y en otros similares. Esta información se usará en un esfuerzo para mejorar continuamente la calidad y la eficacia de la atención médica y servicio que se da.

Asociados comerciales: nuestra organización presta algunos servicios a través de contratos con asociados comerciales. Por ejemplo, el servicio de laboratorio externo para ciertas pruebas de laboratorio. Cuando se contratan estos servicios, podemos revelar su información médica a nuestro asociado comercial para que pueda hacer el trabajo que le pedimos. Sin embargo, para proteger su información médica, es necesario que el asociado firme un contrato con Sarah Bush Lincoln.

Directorio: a menos que usted nos informe de que se opone, usaremos su nombre, ubicación en el centro y la afiliación religiosa para propósitos del directorio. Esta información se puede dar a miembros del clero y, salvo su afiliación religiosa, a otras personas que pregunten por su nombre.

Notificación: a menos que usted nos informe de que se opone, podemos usar o revelar información para notificar a un familiar, representante personal o a otra persona responsable de su atención, su ubicación y condición médica general.

Comunicación con la familia: a menos que usted nos informe de que se opone, los profesionales médicos, usando su mejor criterio, pueden revelar a un familiar, amigo cercano o a cualquier otra persona que usted identifique, información médica relevante para la participación de dicha persona en su atención o pago relacionado con su atención.

Mercadeo: podemos comunicarnos con usted por recordatorios de citas o información sobre alternativas de tratamiento u otros beneficios y servicios relacionados con la salud que pueden ser de su interés.

Investigación: podemos revelar información sin su autorización a investigadores cuando nuestra Junta de Revisión Institucional haya aprobado una exención en la autorización para revelar. El investigador ha establecido protocolos para garantizar la privacidad de su información médica.

Examinador médico: podemos revelar información médica a un examinador médico de acuerdo con lo que autoriza la ley.
Directores de funerarias: podemos revelar información médica a los directores de funerarias de acuerdo con la ley aplicable para que lleven a cabo su trabajo.

<u>Organizaciones para obtención de órganos:</u> de acuerdo con la ley aplicable, podemos revelar información médica a las organizaciones para obtención de órganos o a otras entidades involucradas con la obtención, que funcionen como banco o que trabajen con el trasplante de órganos con el propósito de donación y trasplante de tejidos.

<u>Ayuda en caso de desastres:</u> podemos usar o revelar información médica para propósitos de ayuda en caso de desastres hasta donde lo autorice la ley.

<u>Para detener una amenaza grave:</u> podemos compartir su información médica para prevenir una amenaza grave y urgente para su seguridad o la de alguien más. Por ejemplo: se puede reportar a la policía una amenaza de dañar a otra persona.

<u>Autoridades militares:</u> si usted es miembro o veterano del ejército, podemos compartir su información médica con las fuerzas armadas, de acuerdo con lo que autorice o exija la ley. Podemos compartir información médica sobre personal militar extranjero a la autoridad militar extranjera correspondiente.

<u>Compensación de los trabajadores:</u> podemos revelar información médica hasta donde esté autorizado y sea necesario para cumplir las leyes con relación a la sobre compensación de los trabajadores u otros programas similares establecidos por la ley.
Reporte de salud pública: podemos revelar información médica para las siguientes actividades y propósitos de salud pública:

- Reportar con el propósito de prevenir o controlar enfermedades, lesiones o discapacidades, de acuerdo con lo que exija la ley y afecte a la salud pública.
- ☐Reportar sospechas de abuso, negligencia o explotación infantil o de adultos vulnerables a salud pública o a otras autoridades del gobierno autorizadas por ley.
- Reportar información sobre productos bajo la jurisdicción de la Administración  de Alimentos y Medicamentos de EE. UU.
- Alertar a una persona que pueda haber sido expuesta a una enfermedad contagiosa o pueda de otra manera estar en riesgo de contraer o propagar una enfermedad o condición médica.
- ☐Reportar información a su empleador, según lo exija la ley. Por ejemplo: departamentos de salud estatales y locales y la Administración de Seguridad y Salud Ocupacional (Prevention, and Occupational and Health Administration, OSHA).

<u>Actividades de supervisión de la salud:</u> podemos revelar su información médica a la agencia de supervisión de la salud que garantiza que estamos cumpliendo con los reglamentos de los programas del gobierno, como Medicare y Medicaid.

<u>Institución correccional:</u> si es un recluso de una institución correccional, podemos revelar a la institución o agentes de la misma, información médica necesaria para su salud y la salud y seguridad de otras personas.

<u>Orden público:</u> podemos revelar información médica con propósitos de orden público según lo exija la ley, en respuesta a una citación válida o en cumplimiento con una orden del tribunal. También podemos revelar información médica limitada a la policía o a oficiales del orden público con propósitos de identificación y localización, así como para apoyar en investigaciones criminales.

<u>Recaudación de fondos:</u> podemos usar cierta información (nombre, dirección, teléfono o información de correo electrónico, edad, fecha de nacimiento, sexo, cobertura de seguro médico, fechas de servicio, departamento de información del servicio, información del médico tratante o información sobre el resultado) para comunicarnos con usted con propósitos de recaudar fondos para Sarah Bush Lincoln y usted tendrá el derecho a no seguir recibiendo tales comunicaciones con cada solicitud. Para el mismo propósito, podemos dar su nombre a la Sarah Bush Lincoln Health Foundation.  El dinero recaudado se usará para ampliar y mejorar los servicios y programas que damos a la comunidad. Usted tiene la opción de ya no recibir las solicitudes para recaudar fondos y su decisión no afectará su tratamiento ni el pago de los servicios en Sarah Bush Lincoln.

EFILED
6/27/2023 11:22 AM
Melissa Hurst
Circuit Clerk
Coles County, Illinois

IN THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
COLES COUNTY, ILLINOIS

JOHN DOE, Individually, and on behalf of all )
others similarly situated, )
)
Plaintiff, )
)
v. )
)
SARAH BUSH LINCOLN HEALTH )
CENTER, )
)
Defendant. )
)

2023LA26

Cause No. _____

**NOTICE OF APPEARANCE**

COMES NOW Katie E. St. John of The Cates Law Firm, LLC and enters her appearance on behalf of the Plaintiff.

Respectfully Submitted,

By: _____/s/Katie E. St. John_____
Katie E. S. John, #6340448
THE CATES LAW FIRM, LLC
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone:    (618) 277-3644
Facsimile:    (618) 277-7882
Email:    kstjohn@cateslaw.com

*Attorney for Plaintiff*

Page **1** of **1**

Purchased from re:SearchIL

EFILED
6/27/2023 11:22 AM
Melissa Hurst
Circuit Clerk
Coles County, Illinois

IN THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
COLES COUNTY, ILLINOIS

| | |
|---|---|
| JOHN DOE, Individually, and on behalf of all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>SARAH BUSH LINCOLN HEALTH CENTER, )<br><br>Defendant. ) | **2023LA26**<br><br>Cause No. _____ |

## <u>NOTICE OF APPEARANCE</u>

COMES NOW David Cates of The Cates Law Firm, LLC and enters his appearance on behalf of the Plaintiff.

Respectfully Submitted,

By: _____/s/David Cates_____
David Cates, #6289198
THE CATES LAW FIRM, LLC
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone:    (618) 277-3644
Facsimile:    (618) 277-7882
Email:    dcates@cateslaw.com

***Attorney for Plaintiff***

Purchased from re:SearchIL

EFILED
6/27/2023 11:22 AM
Melissa Hurst
Circuit Clerk
Coles County, Illinois

IN THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
COLES COUNTY, ILLINOIS

| | | |
|---|---|---|
| JOHN DOE, Individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. _____ |
| v. | ) ) | **2023LA26** |
| SARAH BUSH LINCOLN HEALTH CENTER, | ) ) ) | |
| Defendant. | ) ) ) | |

**AFFIDAVIT OF PLAINTIFF'S COUNSEL**
**PURSUANT TO SUPREME COURT RULE 222(b) RE DAMAGES SOUGHT**

David Cates, on oath, deposes and states as follows:

1.    He is an attorney for Plaintiff in the above-entitled cause.

2.    The total of money damages sought by Plaintiff in this action exceeds $50,000.00.

_____
David Cates

Subscribed and sworn to before me this ___27th___ day of June, 2023.

_____
Notary Public

David Cates, #6289198
THE CATES LAW FIRM, LLC
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone:     618-277-3644
Facsimile:     618-277-7882
Email:  dcates@cateslaw.com

OFFICIAL SEAL
ROBIN M MATNEY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 07/13/2026

Page 1 of 1

Purchased from re:SearchIL